**Larry Kenneth ASHWORTH and Dena W. Ashworth**

v.

**STATE FARM FIRE AND CASUALTY COMPANY.**

No. CV 88–1822–LC.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Jan. 23, 1990.

John P. Navarre, Oakdale, La., for plaintiffs.

John S. Bradford, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, La., for defendant.

OPINION

VERON, District Judge.

This is an action on an insurance policy. Plaintiffs, Larry Kenneth Ashworth ("Mr. Ashworth") and Dena Willis Ashworth ("Mrs. Ashworth"), have filed suit against State Farm Fire and Casualty Company ("State Farm") seeking to recover under their homeowner's policy for the loss of their home and its contents by fire. State Farm has asserted the affirmative defense of arson and has filed a counter-claim seeking to recover payment made to the mortgagee and the insureds.

## JURISDICTION AND VENUE

The Court has jurisdiction of the suit on the basis of diversity of citizenship, 28 U.S.C. § 1332. Plaintiffs are citizens of the State of Louisiana. State Farm is a foreign corporation organized under the laws of the State of Illinois with its principal place of business also being in the State of Illinois. The amount in controversy exceeds $10,000, exclusive of interest and costs.

Venue is proper under 28 U.S.C. § 1441, as this case was removed from state court and this is the district court embracing the place where the action was pending.

## THE FIRE

The Ashworths bought and financed a three bedroom brick home on Lisa Lane in Oakdale, Louisiana in 1981. The house was financed through a low income loan offered by the Farmer's Home Administration ("FmHA").

At 12:19 a.m. on August 15, 1987, one of the Ashworth's neighbors called the fire department to report a fire at the Ashworth home. Neither Mr. nor Mrs. Ashworth was at home at the time of the fire.

Chief Thomas Moore ("Chief") was in charge of the Oakdale Fire Department and was one of the first to arrive on the scene. At the trial the Chief was qualified as an expert. He found the front door of the house to be locked and had to kick the door open in order to gain admittance. The Chief testified that there was heavy fire damage on the front of the house out of the picture window and also on the east side of the house. The Chief believes that the fire began in the living room. The fire pattern indicated that it began on the floor. He examined the electrical wiring in the area and ruled out electrical problems as a possible cause of the fire.

The Chief then testified that he found a five gallon plastic container in one of the bedrooms which contained two to three gallons of a liquid. He turned this container and its contents over to the State Fire Marshal. The Chief also testified that the rear door of the house was open when the firemen arrived on the scene and that there was no evidence of forcible entry. The Chief stated that in his belief the fire was intentionally set.

Doug Marshall ("Marshall") was the representative of the State Fire Marshal's Office sent to investigate the fire. He was qualified as an expert at the trial. He arrived in Oakdale about nine or ten hours after the fire. By starting with the least burned area and working back to the worst burned area, he determined that the fire began in the living room near the picture window. He sent the liquid in the container to the laboratory and was informed that the liquid was gasoline. Upon questioning, Mr. Ashworth informed Marshall that there was no gasoline stored in his house. Marshall could find no evidence that the house was broken into. In Marshall's opinion the fire was intentionally set and was accelerated by the gasoline.

Mr. Donald Zwick ("Zwick") was a fire investigator hired by State Farm. Zwick was qualified as an expert. He came down and examined the fire scene on August 18, 1987. Zwick was of the opinion that the fire was intentionally set and that gasoline was used as an accelerant. Zwick determined that temperatures reached by the fire were much higher than those which were possible by the normal burning of household contents. As evidence of this, a photo of a brass table base which had melted from the heat was submitted.

Given all this, this Court can come to no other conclusion but that this fire was intentionally set. But State Farm must show more than that the fire was intentionally set; they bear the burden of establishing

> ... by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it. It is well settled that the insurer need not prove its case against a plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense. Proof, of course, may be and invariably is entirely circumstantial. And, in these instances, a finding for defendant is warranted where the evidence is of such import that it will sus-

tain no other reasonable hypothesis but that the claimant is responsible for the fire.

*Sumrall v. Providence Washington Insurance Co.*, 221 La. 633, 60 So.2d 68 (1952) (citations omitted). "A motive, plus the incendiary origin of the fire, would, in the absence of believable rebuttal evidence, be sufficient to sustain the affirmative defense pleaded by the insurer." *Sumrall,* 60 So.2d at 70.

## WHO SET THE FIRE?

Mrs. Ashworth testified that on August 14, 1987, her husband told her that he was going to spend the night with some friends, first at a fish fry and then camping. Mrs. Ashworth spent the night with her mother, Addie Willis. She found out about the fire at approximately 8:00 a.m. the next morning through a phone call from her sister.

Mr. Ashworth testified that after leaving his wife with her mother, he consumed quite a lot of alcohol. He began by going by and picking up his friend Frank West ("West") to attend a fish fry at Pat West's house. The location of the fish fry was twelve to fourteen miles west of Oakdale. At some point Mr. Ashworth and West left the fish fry. West was driving Mr. Ashworth's truck. They were racing another truck to a convenience store. The last one to the store had to buy a case of beer for the other truck. In their haste to reach the store, the Ashworth truck ended up in a ditch. The men had to get Mr. Farley Cloud to pull them out of the ditch. Mr. Cloud was unsure of the exact time that they came to his house, but he knew that it was before 10 p.m. because he remembered watching the news that night.

After being extracted from the ditch, Mr. Ashworth and West went to a convenience store and bought more beer. After this their journey becomes unclear, depending on who was testifying and at what time they were testifying. It is clear that the two men went to several bars in Oakdale and at the end of the evening instead of going to Mr. Ashworth's house in Oakdale, returned to West's house eleven to fourteen miles out of town to spend the night.

Mr. Ashworth testified that he left Mr. West's house at approximately 7:30 to 8:00 a.m. the next morning to go home. Upon arriving home, he found his home burned.

Mr. Ashworth and his wife both denied in their direct examination that they were having financial problems. At the time of the fire however, Mr. Ashworth had been unemployed since December, 1986. His benefits were set to soon run out and he had been unable to find any work. Mrs. Ashworth worked part-time as a seamstress. On June 22, 1987, less than two months before the fire, they prepared a budget for the FmHA and on Part 3 of the budget they listed monthly earnings of $922.19 per month and expenses of $1,179.78. This was a $257.59 shortfall each month.

On June 9, 1987, the Ashworth's received a letter from FmHA telling them that their house payment was $120.00 past due. The Ashworth's sought a moratorium on their payments, but it was denied. On June 29, 1987, the Ashworth's received another letter from FmHA telling them that their June payment was past due. The letter states that "if this account remains delinquent, I will have no choice but to initiate foreclosure proceedings." On July 8, 1987, they received another letter from FmHA regarding a past due payment. The letter lists two options instead of foreclosure: selling the property or voluntarily reconveying the property to FmHA. On July 22, 1987, the Ashworths received the following letter from the FmHA:

Your account is delinquent $120.00 and has been recommended for foreclosure. The County Supervisor has tried to work with you but you have not responded. I am writing in hope that you will bring your account current so it will not be necessary to start foreclosure.

Remember, your payments may be lowered or suspended if you qualify for interest credit assistance or a moratorium. IMPORTANT—If the above amount is not received or arrangements have not been made to bring your account current by July 27, 1987, the Agency will proceed with foreclosure.

Mr. Mike Perry, the FmHA County Supervisor testified that the Ashworth's had missed their January 1987 payment. They were paying it off by paying $10.00 extra each month. They then missed their May 1987 payment. Because they were late on a partial and one other payment, foreclosure proceedings were threatened.

Mrs. Ashworth testified that her husband would be embarrassed if the house was foreclosed on. Chances of selling the house quickly were remote. There were three empty houses near the Ashworths that had not been sold. Mrs. Ashworth also admitted that they owed $2,000 in outstanding medical bills. They also owed Rush Financial Services $102.96 per month on a note on a travel trailer. It appears from the ledger sheet admitted into evidence that the Ashworths were behind on that note also.

The only item missing from the home after the fire was Mr. Ashworth's favorite gun. It had been given to him by his father and therefore held great sentimental value.

Although conflicting stories were given regarding Mr. Ashworth's whereabouts on the night of the fire, there was testimony that he had been at three different places: Kirby Grocery, Domino's and Oakwood Inn. The Chief measured the distances from each of these places to Mr. Ashworth's home. He found the following:

| LOCATION | DISTANCE | TIME |
|---|---|---|
| Kirby Grocery | 0.7 miles | 1½ minutes |
| Domino's | 1.8 miles | 4½ minutes |
| Oakwood Inn | 2.5 miles | 5 minutes |

The Chief's return trip to the Oakwood Inn took six minutes because he caught a red light.

The Ashworth's testified that Mrs. Ashworth had a key to the front door. Mr. Ashworth had a key to both the front and back doors. Both Ashworths testified that these were the only keys and that both of the doors had been locked when they left the house the last time on the day of the fire. When the firemen arrived on the scene, the back door was open and the Chief found no signs of forced entry.

After the fire Mr. Latour, the State Farm adjustor, told the Ashworths to list the contents of their home. Since Mrs. Ashworth could produce no receipts, Mr. Latour suggested that she obtain the prices of similar goods from a Sears catalog. The defense in their exhibit five took this inventory and categorized it according to the alleged age of the item. The breakdown is as follows:

| AGE OF GOOD | REPLACEMENT COST |
|---|---|
| 1 year or less | $ 7,768.50 |
| 1 to 2 years | 6,529.76 |
| More than 2 years | 13,631.13 |

It is difficult to see how the Ashworths could have purchased so many goods in the two years preceding the fire when they were barely meeting living expenses. Mr. Ashworth testified that he and his wife did not have the money in 1986 or 1987 to buy large items of furniture. There was no evidence that any of the listed items were gifts or were being paid for on time. Mr. Ashworth also testified that one of the children needed dental work and they did not have the money to pay the dentist.

## CONCLUSION

The courts have recognized that arson by an insured will be provable by direct evidence in very few cases. Such fraudulent arson, by its design and nature, will seldom be committed in open daylight, with uninterested witnesses, or without an alibi.

*Fontenot v. Hanover Ins. Co.*, 473 So.2d 145, 148 (La.App. 3rd Cir.1985).

■ The above detailed facts establish that the Ashworth's had a financial motive for setting the fire. Not only would they be free from the mortgage, but they would also have the value of the contents and the land free and clear. Mr. Ashworth also had opportunity. He was within five or six minutes of his home throughout the evening. He could not establish his whereabouts at the time of the fire and instead of going to his nearby home to sleep off his night, he and West drove all the way to West's home. The only item missing from the house after the fire was a gun which had strong sentimental value to Mr. Ashworth.

All of these factors taken together carry State Farm's preponderance of the evidence burden of proof. Plaintiffs argue that even if Mr. Ashworth is found to be responsible for the arson, his wife should still be entitled to recover one-half of the value as an innocent coinsured. While this concept has been accepted by several states, no Louisiana court has adopted it. We decline to do so also. It is at odds with the theories and principles underlying the Louisiana community property system. As the Fifth Circuit said in a similar case dealing with the Texas community property law

> ... [W]e decline to countenance a rule that one who contemplates burning down a community-owned building for the insurance proceeds can expect to recover its full value if the carrier is unable to establish *his* arson, and half of that even if it does, in the event that it is unable to prove that his spouse was an accomplice.

*Norman v. State Farm Fire and Casualty Co.*, 804 F.2d 1365, 1367 (5th Cir.1986).

This theory of recovery is also not allowed under the terms of the policy. Paragraph 14 of Section I of the policy states that

> If you or any person insured under this policy causes or procures a loss to property covered under this policy for the purposes of obtaining insurance benefits then this policy is void and we will not pay you or any other insured for this loss.

Under the terms of the policy, the word "you" includes the named insured and their spouse.

State Farm is therefore entitled to judgment on its counterclaim and to be recompensed for the $34,264.21 it paid to FmHA and for the $1,000.00 paid to the Ashworths.